## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOODSPEED AIRPORT, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 3:06CV930(MRK) |
| | : | |
| EAST HADDAM INLAND WETLANDS | : | |
| AND WATERCOURSES COMMISSION | : | |
| and JAMES VENTRES, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION

This case raises important questions regarding the extent to which Congress intended federal regulation of aviation safety to preempt generally applicable state and local environmental laws.  Plaintiff Goodspeed Airport, LLC, the owner and operator of Goodspeed Airport (hereinafter "Goodspeed" or "the Airport") in East Haddam, Connecticut, seeks a declaration that two Connecticut environmental laws – the Inland Wetlands and Watercourses Act (the "Wetlands Act"), Conn. Gen. Stat. §§ 22a-36 through 22a-45, and the Connecticut Environmental Protection Act (the "CEPA"), Conn. Gen. Stat. §§ 22a-14 through 22a-20 – are preempted by federal aviation law insofar as the state statutes require Goodspeed to obtain a permit before removing certain trees located at the Airport.  Goodspeed claims that the trees are "obstructions to air navigation" under Federal Aviation Administration (FAA) regulations, making them potential hazards to aeronautical safety that the Airport is obligated to remediate.  However, because the trees are located in wetlands protected by the Wetlands Act and the CEPA, Goodspeed is required to obtain permission of the Town of East Haddam's Inland Wetlands and Watercourses Commission (the "Wetlands Commission") before trimming or

removing the trees.  If Goodspeed undertakes the trimming or removal of these trees without the required permit, the Airport could be subjected to civil liability and substantial fines under the Wetlands Act and the CEPA.

After considering evidence presented at a bench trial, and as explained below, the Court concludes that in the particular circumstances of this case, federal regulation of airport safety does not preempt state and local environmental laws in the manner in which Goodspeed asserts. The Court emphasizes that it does not take the Airport's safety concerns lightly, and it does not mean to suggest that the obstructing trees ought to be ignored – there do appear to be a number of trees that pose legitimate safety concerns.   But if Goodspeed wishes to remove the trees that it believes are obstructions, it will need to seek a permit to do so from the Wetlands Commission, which may, consistent with state law, impose conditions designed to mitigate degradation of the wetlands.

## PROCEDURAL HISTORY

Goodspeed filed this action on June 6, 2006 against the East Haddam Wetlands Commission; its enforcement officer, James Ventres; and Gina McCarthy, in her official capacity as the Commissioner of the Connecticut Department of Environmental Protection (DEP).  *See* Compl. [doc. # 1]; Am. Compl. [doc. # 30-2].  Goodspeed sought a declaratory judgment that once trees at the Airport constitute "obstructions to air navigation," local and state agencies are prohibited from interfering with whatever action Goodspeed wishes to take to remediate those obstructions.  It asked further that the Defendants be enjoined from bringing any future action related to the removal of any tree that would qualify as an "obstruction to air navigation" under FAA regulations.  *See* Am. Compl. [doc. # 30-2] at 8.

2

In October 2008, all Defendants moved to dismiss the Amended Complaint, arguing that it failed to alleged a "case or controversy" ripe for adjudication, as required by Article III, Section 2 of the U.S. Constitution.  *See* Mots. to Dismiss [docs. # 61-62].  The DEP also asserted that Goodspeed's claims against Ms. McCarthy in her official capacity were barred by the Eleventh Amendment to the U.S. Constitution.  *See* Mot. to Dismiss of Def. DEP [doc. # 61]; *see also Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003) ("[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States.").  The Court held oral argument on the motions to dismiss, after which it denied the motion of the Wetlands Commission and Mr. Ventres, because it was apparent that there was a real and live controversy between Goodspeed and local officials, and obtaining a declaratory ruling before the trees were actually removed seemed the preferable course of action for all concerned, including the trees. *See* Order [doc. # 88].  During oral argument, and in light of the very important issues of state law and policy at stake, the Court urged the State of Connecticut to reconsider its assertion of an Eleventh Amendment defense so that it could participate fully in this action.  Nonetheless – and much to the Court's chagrin – the State notified the Court that it was "disinclined" to waive its Eleventh Amendment defense.  *See* Notice [doc. # 90].  In effect, the State voluntarily absented itself from this case even though it raised important issues regarding state law, leaving the Town on its own to defend state laws.  In view of the State's position, the Court granted its motion to dismiss on the basis of the Eleventh Amendment.  *See Goodspeed Airport, LLC v. East Haddam Wetlands Comm'n, et al.*, 632 F. Supp. 2d 185, 189-90 (D. Conn. 2009).

Also during oral argument, the Court suggested that it would seek the opinion of the FAA on Goodspeed's preemption claims.  The Airport and the remaining defendants, the Wetlands Commission and James Ventres (hereinafter referred to collectively as simply "Defendants" or

3

"the Wetlands Commission"), agreed that the FAA's views could be useful.  The parties were therefore asked to collaborate on producing a set of stipulated facts and proposed questions that the Court could submit.  *See* Order [doc. # 88]; *see also* Parties' Proposed Questions [doc. # 92].

Accordingly, on August 4, 2009, the Court sent a letter to the U.S. Attorney's Office for the District of Connecticut requesting that the FAA and/or the U.S. Government answer a series of questions related to Goodspeed's claims.  *See* Letter [doc. # 95].  Those questions were:

1. Does 49 U.S.C. § 40103(a)(1) of the Federal Aviation Act completely preempt Conn. Gen. Stat. §§ 22a-42a(a) and (c)(1) and the regulations promulgated thereunder regulating wetlands in the State of Connecticut?

2. Does 49 U.S.C. § 40103(a) of the Federal Aviation Act completely preempt Connecticut's Environmental Protection Act, Conn. Gen. Stat. § 22a-16?

3. Does 49 U.S.C. § 41713(b)(1) of the Airline Deregulation Act completely preempt Conn. Gen. Stat. §§ 22a-42a(a) and (c)(1) and the regulations promulgated thereunder regulating wetlands in the State of Connecticut?

4. Does 49 U.S.C. § 41713(b)(1) of the Airline Deregulation Act completely preempt Connecticut's Environmental Protection Act, Conn. Gen. Stat. § 22a-16?

5. Does 49 U.S.C. § 41713(b)(1) of the Airline Deregulation Act apply to Goodspeed Airport?

6. To what extent is a licensed, privately-owned and operated commercial airport that receives no federal funds or aid bound by or subject to the FAA regulations set forth in 14 C.F.R. Part 77?

7. To what extent is the FAA interested in issues concerning terrain growth into navigable airspace at a licensed, privately-owned and operated commercial airport that receives no federal funds or aid?

*Id.*

A few days before a bench trial, on November 30, and pursuant to 28 U.S.C. § 517,[1] the United States submitted a Statement of Interest that addressed the Court's questions.  *See* Statement of Interest of the United States ("Statement of Interest") [doc. # 112].  The Statement of Interest is discussed in more detail below, but in brief, it stated that while "[t]he FAA has a strong interest in monitoring terrain growth on airport property as it relates to air safety," the Federal Aviation Act "does not facially preempt generally applicable state environmental laws," including the Wetlands Act and the CEPA.  *Id.* App. A at 1-2.  The United States also confirmed that Part 77 of the FAA regulations does apply to Goodspeed Airport, but that those regulations do *not* authorize the FAA to order the removal of an obstruction.  *See id.* at 2 ("The regulations do not amount to a federal directive to an airport proprietor to remove the obstruction or hazard in question, nor to a grant of power to an airport proprietor to do so.").  Finally, the Statement of Interest opined that the Airline Deregulation Act does not expressly preempt the state laws at issue because they "do not have a significant effect on the operations of air carriers at Goodspeed Airport." *Id.* at 1-2.

The State of Connecticut also sought permission to file an amicus curiae brief on behalf of the Defendants.  *See* Mot. for Leave to File Amicus Curiae Br. [doc. # 98].   The Court granted the State's request, *see* Order [doc. # 101], and the State filed its brief, though the majority of the brief focused on conflict preemption, *see* Amicus Curiae Br. of the State of Connecticut [doc. # 108] – a claim that Goodspeed has explicitly not pursued in this case.  *See* Pl.'s Pre-Trial Br. [doc. # 107] at 12 n.6.

---

[1] "[A]ny officer of the Department of Justice[] may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

On December 4, 2009, the Court held a one-day bench trial. At trial, Goodspeed submitted some thirty exhibits and the live testimony of five witnesses. *See* Ex. Lists [docs. # 114, 115]; Witness List [doc. # 115].

First to testify was Timothy Mellon, the sole member of Plaintiff Goodspeed Airport, LLC, which purchased the Airport in 1999.  Mr. Mellon is also a pilot licensed by the FAA, the owner of two aircraft, and the former owner and operator of an air carrier.  Mr. Mellon testified that at least since he has owned the Airport, it has not received any federal funding, and that while Goodspeed does not have any regularly-scheduled passenger service, the Airport is utilized by privately-owned aircraft and an air charter (or "air taxi") operation, Action Airlines.  Mr. Mellon said that the Airport has between 25 and 30 daily departures and arrivals in the summer and approximately 5 to 6 per day in the winter.  Goodspeed charges $5 per-landing and a $10 fee for storing a plane overnight.  Mr. Mellon stated that as the owner, he is responsible for the Airport's upkeep, which includes maintaining the integrity of the runway surface; keeping wildlife off the runway; ensuring that the Airport is properly lit; and monitoring the security of its hangars, fences, and gates.  The Airport does not have a control tower, and does not have prescribed instrument procedures.  Therefore, arrivals and departures are typically accomplished pursuant to visual flight rules. The Airport is self-controlled by those using it; there is no employee located at the airport on a regular basis.

Mr. Mellon explained that pilots are permitted to land and depart in either direction of the Airport's single paved runway, which runs in a general north-south orientation.  Goodspeed Airport has what is defined as a "utility runway," accommodating propeller-driven aircraft weighing 12,500 pounds or less.  *See* 14 C.F.R. § 72.2.  No matter which direction an aircraft is flying, the pilot must navigate certain "obstructions" – primarily trees and other vegetation, but

6

also, in regards to a northern approach, a bridge.  Goodspeed Airport is situated on the eastern bank of the Connecticut River, and is surrounded by marshland.  The Airport also serves as a seaplane base for aircraft arriving and departing on the river.  Mr. Mellon said that the trees that primarily concern him are located on either side of the runway near its southern end.[2]  Mr. Mellon stated his belief that these trees constitute threats to the safe operation of the Airport, and that he has both a legal and moral obligation to make the Airport as safe as possible.  He acknowledged that the trees have been growing on the Airport property for decades – long before he purchased the Airport – and have long constituted "obstructions" under FAA regulations. Some of the trees are in excess of 50-60 feet in height.  But Mr. Mellon said that because he believes the trees make the Airport unsafe, he feels compelled to remove them entirely; or, at the very least, to cut them down to the point where they would no longer be considered obstructions – which, in many cases, would require cutting the trees to the ground.  Moreover, he does not wish to seek permission from the Wetlands Commission, which may require him to undertake mitigation efforts to minimize damage to the wetlands.  Rather, Mr. Mellon wants to remove the trees at whatever time and in whatever manner he deems appropriate.

Mr. Mellon also explained that the Airport is licensed by the State of Connecticut, which issues such licenses every three years.  And although he acknowledged that Goodspeed's license was most recently renewed by the State in June 2009 after an inspection by the Connecticut Department of Transportation (DOT) in late 2008 or early 2009, Mr. Mellon testified that the State has implicitly threatened to revoke Goodspeed's license if the tree obstructions are not

---

[2] Previously, there were trees beyond the southern end of the runway that concerned Mr. Mellon. Those trees, which were not on the Airport's property, were the subject of previous litigation in Connecticut state court.  *See* note 5, *infra*.  The trees at issue in this lawsuit are only those situated on the Airport's property.

remedied.  This implicit threat, according to Mr. Mellon, is contained in letters sent by DOT to a prior owner of the Airport in the late 1970s and early 1980s.  *See* Trial Ex. 6.  Mr. Mellon conceded, however, that neither the DOT nor the FAA has ordered him to lower the trees or given him any indication that it intends to take any action to close the Airport if the trees are not removed or trimmed.

Mr. Mellon also confirmed that he has not applied to the Wetlands Commission for a permit to trim or remove the trees, but stated that if he were to apply, and were his application denied, one option that he would consider would be closing the Airport.  If he took that option, the aircraft that currently use Goodspeed Airport would be forced to use other area airports.  On cross-examination, however, Mr. Mellon stated that another alternative to removing the trees would be to use what is known as a "displaced threshold."  Instead of utilizing the entire length of the runway, aircraft would treat a line painted across the runway some distance from its paved end as the effective end of the runway.  This line – the "displaced threshold" – would effectively shorten the usable portion of the runway, but it would permit aircraft sufficient clearance over the obstructing trees.  *See* Trial Ex. 9 (W. Stannard Dep.) at 20-23 (discussing displaced thresholds).  According to Mr. Mellon, however, shortening the runway in this manner would make the runway less safe for arriving and departing aircraft; he therefore stated that he would use a displaced threshold only "reluctantly and hopefully temporarily."  Mr. Mellon also confirmed that even were he to remove the obstructing trees located on the Airport property, other trees on the property of adjacent homeowners would still be considered "obstructions" due to their height and location, *see* Pl.'s Ex. 13a (Airport Survey), but Mr. Mellon disavowed any authority to remove or trim the trees located on his neighbors' properties.

8

Next to testify was Donald L. Gesick, Jr., a professional land surveyor.  Mr. Gesick's testimony introduced a survey that he conducted of the Airport.  His report plotted the location, girth, and height of the trees and shrubbery on the Airport property, as well as the precise locations of its runway and hangars.  The Court has attached a slightly-modified version of Mr. Gesick's final survey, s*ee* Trial Ex. 13b (Airport Survey dated June 19, 2006, revised July 1, 2008), as Appendix A to this opinion.[3]  After Mr. Gesick completed the Airport Survey, it was then used by James B. Downar, Jr., an expert on airport design and safety, to calculate which of the trees constituted "obstructions to air navigation."[4]  Mr. Downar's analysis applied the definitions contained in Part 77 of the Federal Aviation Regulation (FAR), 14 C.F.R. Part 77, which are explained in more detail below.

Applying the measurements in FAR 77 to Mr. Gesick's survey, Mr. Downar calculated that a great number of trees (including an entire tree line) on Goodspeed's property are indeed "obstructions to air navigation" – some by more than 50 feet.  Mr. Downar and Mr. Gesick also suggested that, although they did not explicitly consider the Airport's hangars in their respective analyses, the hangars may also technically count as "obstructions," depending on their height (which is not in the record).  Mr. Downar confirmed that lowering the trees to the point at which they would no longer be considered obstructions would involve, at least in many situations, effectively cutting them to the ground.  However, Mr. Downar, who has conducted obstruction

---

[3] No substantive alterations were made to Mr. Gesick's survey, but in order to improve clarity, the Court darkened the green line representing the treelines at the Airport; added labels for the treelines, hangars, and the private homes near Goodspeed; and excised some material that did not reproduce accurately.

[4] Mr. Downar is the Chief Airport Engineer for Hoyle Tanner and Associates, a consulting engineering firm. *See* Trial Ex. 14 (Downar Curriculum Vitae).  He also provided expert testimony in *Tweed-New Haven Airport v. Town of East Haven*, 582 F. Supp. 2d. 261 (D. Conn. 2008).  *See id.*, 582 F. Supp. 2d. at 264 n.4.

analyses at a number of area airports, *see* Trial Ex. 16 (List of Obstruction Studies), and who said that he has worked with wetlands commissions in other states on removing trees as obstructions, also testified that tree obstructions are a "fact of life" with most airports, including utility airports, and that they are tolerated to varying degrees depending on their relative impact on the safety of the airport.  As to Goodspeed Airport, Mr. Downar testified that in his expert opinion, the tree obstructions do not pose such a risk to its safety that the Airport should be shut down.  In fact, he testified that he was not aware of the FAA ever shutting down an airport because of tree obstructions.   He emphasized, though, that the obstructions should not simply be ignored, especially a few particularly inconveniently-located trees.   Mr. Downar also noted two alternatives to removing the trees.  First, the airport could use a displaced threshold.  Second, the airport could light the trees so that they would be more visible to pilots in low-light situations.  To date, Mr. Mellon has not lit the trees that he considers obstructions.

Mr. Downar also confirmed that simply because a tree or other object constitutes an "obstruction to air navigation" does not automatically render it a "hazard to air navigation" under FAA regulations.  In his experience, an "obstruction" only becomes a "hazard" after the FAA has made that determination; to his knowledge, the FAA has made no hazard determination as to any obstruction located at Goodspeed Airport.  Mr. Downar further confirmed that the FAA has no authority to order the removal of trees or other obstructions from airports, though they may, in appropriate circumstances, condition licensing or funding on removal or the trees or obstructions.

Goodspeed's final witness was John A. Rutledge, Jr.  Mr. Rutledge is the owner of JIB, Inc., which does business as Action Airlines.  JIB, Inc. is an air carrier licensed by the FAA under Part 135 of the Federal Aviation Regulations, 14 C.F.R. Part 135.  *See* Trial Ex. 21 (JIB, Inc. Part 135 Air Carrier Certificate).   Action Airlines currently has one airplane with the

10

capacity to carry six individuals (including the pilot).   The airplane is stored at Goodspeed Airport, and Action Airlines has operated out of Goodspeed Airport as a Part 135 air carrier since 1979.  Currently, Mr. Rutledge is Action Airlines' only full-time employee.  In addition to being a licensed pilot for more than 50 years, Mr. Rutledge is a pilot instructor and previously served for a number of years as a pilot examiner on behalf of the FAA.  He has the further distinction of being one of the relatively few pilots to receive the Wright Brothers Award, an award that the FAA gives to pilots who have flown for at least 50 years without an accident or regulatory violation.  *See* Trial Ex. 22 (Rutledge Wright Bros. Award).

Mr. Rutledge, whose home and office are adjacent to Goodspeed, has been flying into and out of the Airport since shortly after it opened in the mid-1960s.   He described Action Airlines as essentially an "airborne limousine service," providing point-to-point transportation to and from airports in the region.  Fees for this service are set either on a per-mile or per-hour basis.   Mr. Rutledge estimated that in the first 11 months of 2009, Action Airlines had transported approximately 300 to 400 individuals.  Mr. Rutledge said that, given his experience with the Airport, he does not consider the tree obstructions to be a safety concern; indeed, he testified that he did not believe Goodspeed Airport to be unsafe at all, and that he has every intention of continuing to operate Action Airlines out of the Airport in the future regardless of whether the trees are trimmed or removed.  He did note, however, that the trees could pose a concern for less experienced pilots while they are landing, because the trees – especially those that line the Connecticut River – block the wind that typically blows in from the west and southwest, perpendicular to the Airport's runway.  Mr. Rutledge explained that once a landing aircraft drops below the trees, the intensity of the crosswind is significantly lessened, which inexperienced pilots may not anticipate and which could contribute to an airplane landing short

11

of the runway's edge.  Mr. Rutledge testified that he believed that this was a cause of the last accident that occurred at Goodspeed Airport, in 1999.  *See* Trial Ex. 8 (Hartford Courant article). Mr. Rutledge noted, however, that trees and buildings create the same issue at other Connecticut airports, and that in his substantial experience at Goodspeed Airport, there have been very few accidents.

Mr. Rutledge also testified that lighting the trees could alleviate at least some of the safety concerns with using the Airport at night, but that a displaced threshold could impact the operation of Action Airlines, depending on how much shorter it made the runway.  Were the runway shortened too much, he may have to limit the weight of his airplane's cargo (be it passengers, luggage, or fuel) in order for the airplane to be able to clear any obstacles during takeoff or for it to stop on the shortened runway.  Finally, Mr. Rutledge said that in the event that Goodspeed Airport closed, he would relocate his air taxi service to any number of different airports in the area.  Relocation would affect the fees Action Airlines charges for its services, since its clients would have to pay for the additional time Mr. Rutledge spent commuting to and from this alternate location.

Following Mr. Rutledge, the Defendants called Defendant James Ventres as their only witness.  Mr. Ventres is the land use administrator for the Town of East Haddam, and his duties include serving as the enforcement officer for Defendant Wetlands Commission.  Mr. Ventres has held that position since 1995; prior to that, he served as a member of the Wetlands Commission from approximately 1983.  Mr. Ventres testified that Goodspeed Airport has two types of wetlands regulated by the Wetlands Act.  The entire Goodspeed Airport sits on a designated flood plain, and is sometimes completely under water.  Additional portions of the airport are also considered the more traditional "wetlands" due to the soil's typical moisture level.

12

Mr. Ventres said that while Goodspeed did submit an application to the Wetlands Commission for permission to extend the Airport's runway in 2002 or 2003, that application was withdrawn without an official explanation and before the Wetlands Commission had made a final determination.  Goodspeed Airport has not submitted a permit application to the Wetlands Commission since.[5]

Mr. Ventres testified that in recent years the Wetlands Commission has approved applications to remove and/or trim trees and other vegetation in regulated wetlands; he gave as an example a developer that was permitted to construct a golf course that traversed regulated wetlands.  Upon consideration of the application, the Wetlands Commission permitted the construction to take place under certain conditions meant to minimize and mitigate its environmental impact, including refraining from using large equipment; leaving stumps of felled trees in place; and undertaking the regulated activity when the ground was frozen.  Mr. Ventres – who, as the Wetlands Commission enforcement officer, does not vote on permit applications – explained that the Wetlands Commission regulations set forth various requirements for applications and certain criteria that the Commission must take into account when considering

---

[5] In the last several years, there has been substantial litigation concerning whether and to what extent Goodspeed could trim or remove trees on land adjacent to the Airport that it does not own. *See, e.g.*, *Rocque v. Mellon*, 275 Conn. 161, 169-70 (2005) (holding, *inter alia*, that the Airport's clear cutting of trees on adjacent land without a permit was an unreasonable destruction and pollution of the wetlands, in violation of the CEPA), *cert. denied*, 547 U.S. 1111, 126 S.Ct. 1913 (2006); *Ventres v. Goodspeed Airport*, 275 Conn. 105, 150 (2005) (affirming the trial court's holdings that Goodspeed Airport had acquired a prescriptive easement to trim trees on adjacent property, but that the Airport had impermissibly exceeded the scope of that easement by clear-cutting the land, in violation of the Wetlands Act), *cert. denied*, 547 U.S. 1111, 126 S.Ct. 1913 (2006); s*ee also Goodspeed Airport, LLC v. East Haddam Land Trust, Inc.*, No. 01CV403, 2005 WL 1403822, at *4-6 (D. Conn. June 13, 2005) (holding that the Wetlands Commission's cease and desist order, which ordered the Airport to refrain from conducting any regulated activity in land adjacent to the Airport, did not violate either procedural or substantive due process), *aff'd*, No. 05-0622-CV, 2006 WL 197463, at *2 (2d Cir. Jan. 27, 2006).

applications.  *See* Trial Ex. 501 (Regulations of the Town of East Haddam Inland/Wetlands and Watercourses Commission (revised Oct. 1, 2004)).  In considering an application, the Wetlands Commission considers whether there are "reasonable and prudent alternatives" to the proposed activity that would cause "less or no environmental impact to the wetlands or watercourse."  *See id.* § 10.2(b); *see also* Conn. Gen. Stat. § 22a-41(a)(2).  In applying this standard, the Wetlands Commission will frequently attach conditions to its approval of an application, such as requiring that the activity take place in specific times of the year, using certain methods designed to minimize impact, replacing the removed vegetation with other trees or shrubs that will continue to hold the soil in place, and/or utilizing other mitigation techniques.  *See generally* Conn. Gen. Stat. § 22a-41(a).  On cross-examination, Mr. Ventres acknowledged that since Goodspeed has not submitted an application, he cannot speculate what it would be permitted to do regarding the trees it wishes to remove and/or trim.  Mr. Ventres also agreed that the Wetlands Commission application process can last several months.

Following the testimony, Plaintiff's exhibits 1 through 30 were admitted as full exhibits, as was Defendants' Exhibit 501.  *See* Trial Ex. Lists [docs. # 114 – 115].  One of Plaintiff's exhibits is the deposition testimony of Warren Stannard.  *See* Trial Ex. 9 (May 12, 2003 Stannard Dep.); Trial Ex. 9a (exhibits to Stannard Dep.).  The deposition was taken for previous actions involving these parties, *Ventres et al. v. Goodspeed Airport, et al.*, Nos. TTD-CV01-76812-S, HHD-CV01-4025085-S (Conn. Super. Ct. filed Apr. 23, 2001); *Rocque v. Mellon, et al.*, Nos. TTD-CV02-80540-S, HHD-CV02-4025413-S (Conn. Super. Ct. filed Dec. 2, 2002).[6]  At the time of the deposition, Mr. Stannard was the Supervising Airport Engineer in the DOT's Bureau of Aviation and Ports, and was responsible for inspecting all of Connecticut's airports, including

---

[6] *See* note 5, *supra*.

Goodspeed.  *See* Trial Ex. 9 (Stannard Dep.) at 10-13.  Following the deposition but before the

trial in this case, Mr. Stannard retired and moved out of Connecticut.  *See* Joint Trial Mem. [doc.

# 96] at 10.  Under these circumstances, the Court permitted Mr. Stannard's deposition testimony

to be marked as a full exhibit.  *See* Fed. R. Evid. 804(b)(1).

## FINDINGS OF FACT

Pursuant to Rule 52 of the *Federal Rules of Civil Procedure*, the Court makes the

following findings of fact, which are drawn from the stipulation of uncontroverted facts in the

parties' Joint Trial Mem. [doc. # 96]; the exhibits introduced at trial, *see* Trial Ex. Lists [docs.

# 114, 115]; and the live testimony at trial, *see* Witness List [doc. # 115].  Other findings of fact

will be introduced as necessary.

Goodspeed Airport, located in East Haddam, Connecticut, is a small, privately-owned

airport open for public use, as defined by 14 C.F.R. § 72.2.  The Airport was established in 1964

and maintains a "utility runway," which is intended to accommodate propeller-driven aircraft

weighing 12,500 pounds or less.  *See* 14 C.F.R. § 72.2.  Approaches to the Airport are governed

solely by visual (as opposed to instrument) flight rules.  *See id.*  The Airport does not provide

regularly-scheduled passenger service and does not receive any federal funds or aid.  As a

consequence, the Airport does not have (and is not required to have) a certificate issued by the

FAA under Part 139 of the Federal Aviation Regulations.  In fact, because Goodspeed does not

serve scheduled air carrier operations, the FAA apparently does not have the statutory authority

to directly license or certify Goodspeed Airport at all.  *See* 49 U.S.C. § 44706(a)(2) (granting the

FAA the authority to certificate airports serving scheduled air carrier operations using aircraft of

at least 10 passenger seats, except in Alaska); *see also id.* § 44706(a)(3) ("Nothing in this title

may be construed as requiring a person to obtain an airport operating certificate if such person does not desire to operate an airport [serving scheduled air carrier operations].").

Instead, Goodspeed Airport is licensed and regulated by the State of Connecticut. Within Connecticut, jurisdiction over and responsibility for airports have been entrusted to the Commissioner of the Department of Transportation (hereinafter, "the Commissioner"). *See* Conn. Gen. Stat. § 13b-39; *Conn. Air Serv. v. Danbury Aviation Comm'n*, 211 Conn. 690, 696 (1989) ("[T]he legislature . . . has charged the commissioner of transportation with the supervision and control of virtually every aspect of aeronautical activity conducted within the state, including that carried out at a municipal level[;] . . . such supervision and control is principally a state function and duty."). The Commissioner is given the authority to issue and renew airport licenses, which are effective for three years, *see* Conn. Gen. Stat. § 13b-46(b), and to revoke licenses upon a determination that an airport "is not being maintained or used in accordance with" Connecticut's statutes and regulations regarding aviation. *Id.* § 13b-49; *see also* Conn. Agencies Regs. § 15-41-27. Any air navigation facility at which more than 36 takeoffs and landings are expected to be made in any year must obtain a license. *See* Conn. Gen. Stat. § 13b-46(a). Pursuant to specific statutory authority, *see id.* § 13b-41(b), the Commissioner has promulgated various regulations related to the safety of Connecticut's airports. *See* Conn. Agencies Regs. §§ 15-41-18 through 15-41-35. Goodspeed's license was last renewed in approximately June 2009, and is currently valid through May 1, 2011. *See* Trial Ex. 3 (Goodspeed Airport License). The record suggests that Goodspeed has remained licensed and operational without interruption since opening in 1964, despite the continual presence of trees that constitute "obstructions."

16

The Connecticut General Assembly has also given the Commissioner the authority to require landowners to remove obstacles that "constitute a hazard to aerial navigation or to the efficient or safe use of any airport."  Conn. Gen. Stat. § 15-74(a).  An "airport hazard" is defined as "any structure, object of natural growth or use of land which obstructs the air space required for the flight of aircraft in landing or taking off at any airport, heliport or restricted landing area or is otherwise hazardous to such landing or taking-off."  *Id.* § 15-34(8).  The Commissioner also may condition the approval of an airport license on the removal of an obstacle "at or near the landing area."  *Id.* § 15-74(b).  If such a condition is imposed, the applicant for the airport license is required to compensate the owner of the obstacle for its removal.  *See id.*  Goodspeed has not provided any evidence that the Commissioner has ever required Goodspeed or any nearby landowner to remove any obstacle or airport hazard.

Although not licensed by the FAA, Goodspeed Airport must participate in the "Airport Safety Data Program."  This program was established in 1981 by FAA Order 5010-4, which describes it as "the primary means for collection, maintenance and dissemination of information related to public-use airports."  State agencies throughout the country collect this information through "5010 Inspections."  In Connecticut, according to Mr. Stannard, the DOT conducts the inspections approximately once every three years.  *See* Trial Ex. 9 (Stannard Dep.) at 11.  During the inspection, the DOT inspector collects basic technical information about the airport (runway length, services offered, etc.), as well as safety-related information, including data on obstructions, as defined in Part 77 of the FAA regulations.  *See generally id.* at 10-34.  This information is submitted to the National Flight Data Center, *see id.* at 14, which then updates the "Airport Master Record" for every public-use airport in the country.  The Airport Master Records are published in the FAA's "Airport/Facilities Directory," as well as in other FAA publications

17

and on the internet.  The information in the Directory is used primarily by pilots flying into an unfamiliar airport for the first time.

The definitions and standards for determining what constitutes an "obstruction to air navigation" are found in Part 77 of the Federal Aviation Regulations (FAR), 14 C.F.R. Part 77. The FAA promulgated these regulations pursuant to a Congressional directive.  *See* 49 U.S.C. § 44718(a).  The Part 77 regulations – which explicitly apply to "objects of natural growth," 14 C.F.R. §§ 77.5(a), 77.21 – state in relevant part that an object is considered "an obstruction to air navigation" if it is of greater height than any one of several imaginary surfaces.  *See id.* § 77.23(a)(5).  One of those imaginary surfaces is called the "primary surface."  *See id.* § 77.25. The length of the primary surface extends 200 feet beyond each end of the runway.  *See id.* § 77.25(c).  For utility airports with only visual approaches such as Goodspeed, the primary surface is 250 feet wide, longitudinally centered on the center of the runway (that is, extending 125 feet on either side of the center line of the runway).  *See id.* § 77.25(c)(1).  Since the runway at Goodspeed is 50 feet wide, *see* Trial Ex. 5, this means that the primary surface is 75 feet wider on each side of the paved portion of Goodspeed's runway.  Also relevant here are the "approach surface" and the "transitional surface."  The "approach surface" is applied to each end of the primary surface, and for an airport such as Goodspeed, it is 1250 feet wide and extends for a horizontal distance of 5,000 feet at a slope of 20-to-1 (that is, 20 feet up for every 1 foot out). *See* 14 C.F.R. § 77.25(d).  The "transitional surface" is shaped like a trapezoid; it flares upwards and outwards at right-angles from the edge of the primary surface to 1250 horizontal feet at a slope of 7-to-1. *See id.* § 77.25(e).  Together, the primary surface, approach surface, and the transitional surface create what is, in essence, a "bowl" of airspace, and any object – including a

18

tree – that penetrates any of these imaginary surfaces is considered, by definition, an "obstruction to air navigation." *See id.* § 77.23(a)(5).

The parties have stipulated that certain of the trees at Goodspeed penetrate both the "primary surface" and the "transitional surface" such that they are "obstructions to air navigation" under Part 77. *See* Joint Trial Mem. [doc. # 96] at 4. The testimony of Mr. Gesick and Mr. Downar supports this stipulation, as well as the conclusion that the trees also penetrate the "approach surface." *See* Trial Exs. 18a-18b (Downar Obstruction Calculation Charts). A review of the DOT inspections of Goodspeed over the past 30 years reveals that the Airport has long experienced substantial tree obstructions. *See* Trial Exs. 5-7, 23-30. However, Goodspeed is not unique in this regard, even within Connecticut; in fact, the vast majority of airports in the State have obstructions (mostly trees), which appear to be a chronic problem for all airports. *See generally* Conn. Statewide Airport System Plan (June 2006), *available at* http://www.ct.gov/dot/lib/dot/documents/dpolicy/table_contents.pdf (discussing obstructions at each of Connecticut's public-use airports); *see also id.* § 7-8 (suggesting, as a way to address obstructions, legislation "to specify permitted land uses and zoning to include height restrictions").

The crux of this case turns in large part on the import of the determination that the trees at Goodspeed are "obstructions" under Part 77. Significantly, nothing in either Part 77 or its authorizing statute, 49 U.S.C. § 44718, grants the FAA the power to regulate how land is used insofar as structures that may penetrate navigable airspace are concerned. In other words, the FAA cannot require that a structure or object be altered or removed, even if it is an obstruction; instead, the regulations focus on studying potential hazards and giving notice to interested individuals. Thus, for example, Part 77 requires notice to be given to the FAA of any proposed

structure that would be more than 200 feet above ground level at its site, *see* 14 C.F.R. § 77.13(a)(1), as well as any proposed construction or alteration that would be of greater height than an imaginary surface extending outward and upward from any public use airport's runway at certain slopes (depending on the length of the runway). *See id.* § 77.13(a)(2). Similarly, any proposed construction or alteration of an airport itself requires notice to be given to the FAA, either under § 77.13(a)(5) or Part 157.[7]

Once the FAA has been given notice under Part 77, the FAA's Obstruction Evaluation Service has the responsibility for conducting an "obstruction evaluation" to determine the effect, if any, that the proposed construction or alteration would have on navigable airspace. *See* FAA Order JO 7400.2G, "Procedures for Handling Airspace Matters" § 5-1-5 (amended Aug. 27, 2009), *available at* http://www.faa.gov/air_traffic/publications/atpubs/AIR/INDEX.HTM. The result of a study under Part 77 "is normally a determination as to whether the specific proposal studied would be a hazard to air navigation." 14 C.F.R. § 77.31(b). But even when the Obstruction Evaluation Service determines that the proposed construction or alteration would result in a "hazard to air navigation," the FAA has no authority to require the proposal to be altered.[8] Rather, the hazard is noted in FAA publications (including, if applicable, the relevant

---

[7] The notice provisions of Part 77 and Part 157 do overlap some, but notice is never required to be given under both Parts. *See* 14 C.F.R. § 77.15(d) ("No person is required to notify the Administrator for any . . . construction or alteration for which notice is required by any other FAA regulation.").

[8] Other agencies may condition their own actions on the outcome of an obstruction evaluation. For example, 49 U.S.C. § 44718(c) requires the FCC to consult with the FAA when considering whether to approve a new radio broadcast tower. Accordingly, the FCC requires that the FAA be given notice of any proposed broadcast towers over a certain height, *see* 47 C.F.R. § 17.7, and the FCC generally only authorizes construction if the FAA makes a "no hazard" determination. *See* 47 C.F.R. § 17.4(b); *see also Big Stone Broad., Inc. v. Lindbloom*, 161 F. Supp. 2d 1009, 1019 (D.S.D. 2001).

Airport Master Record) so that pilots and other affected individuals are made aware of it.  *See Aircraft Owners and Pilots Ass'n v. FAA*, 600 F.2d 965, 966-67 (D.C. Cir. 1979) ("Once issued, a hazard/no-hazard determination has no enforceable legal effect.  The FAA is not empowered to prohibit or limit proposed construction it deems dangerous to air navigation.").

Likewise, when the FAA is given notice under Part 157, the FAA's Airports Division conducts an "airport airspace analysis."  *See* FAA Order JO 7400.2G § 12-1-1.  This analysis considers:

> [T]he effects the proposed action would have on existing or contemplated traffic patterns of neighboring airports; the effects the proposed action would have on the existing airspace structure and projected programs of the FAA; and the effects that existing or proposed manmade objects and natural objects within the affected area would have on the airport proposal.

14 C.F.R. § 157.7(a).  The airport airspace analysis results in a "determination" of the proposal – either "no objection," "conditional," or "objectionable" – but no matter the outcome of the analysis, the regulation is explicit that "[a] determination does not relieve the proponent of responsibility for compliance with any local law, ordinance or regulation, or state or other Federal regulation.  Aeronautical studies and determinations will not consider environmental or land use compatibility impacts."  *Id.*; *see also Air Line Pilots' Ass'n Int'l v. FAA*, 446 F. 2d 236, 240 (5th Cir. 1971) ("[T]he determination promotes air safety through 'moral suasion' by encouraging the voluntary cooperation of sponsors of potentially hazardous structures.").

Finally, the FAA also has issued an order that deals with obstruction-related issues with even more specificity.  *See* FAA Order JO 7400.2G, "Procedures for Handling Airspace Matters" (the "FAA Order").  And while Parts 77 and 157 and their authorizing statute, 49 U.S.C. § 44718, seem to apply just to proposals for alterations or new construction projects (as described above), Section 6-1-3 of the FAA Order explains that the FAA does conduct studies of

21

existing structures, including trees, "when deemed necessary by the FAA."  The FAA Order lists

several situations "that may require obstruction evaluation of existing structures." *Id.* § 6-1-3(b).

Such circumstances include "[d]etermining whether the FAA should recommend that an existing

structure be altered or removed" and "[p]roviding technical assistance or information to a person,

or government organization (Federal, state or local) expressing an interest in the structure and the

FAA's responsibility associated with the structure's effect on the safe and efficient use of

navigable airspace." *Id.* §§ 6-1-3(b)(4) & (9).  In addition to the procedures outlined in Part 77

and Part 157, a study of an existing structure may be initiated as a result of "information received

or a situation observed"; a "request for study from . . . a person with a valid interest in the

matter"; and "[o]ther situations for which an aeronautical study would be appropriate." *Id.* § 6-1-

3(a).  *See also* FAA, Obstruction Evaluation/Airport Airspace Analysis, http://oeaaa.faa.gov

(providing more information on the FAA's "obstruction evaluation" and "airport airspace

analysis" procedures).

It is undisputed that the FAA has not conducted any study of the trees at Goodspeed,

much less determined that they are "hazards to air navigation."  But even if the FAA had done

so, the FAA has no authority to order that obstructions or hazards be remediated.  And unlike

airports licensed by the FAA under Part 139, Goodspeed is licensed only by the State of

Connecticut, meaning that the FAA could not even condition Goodspeed's license on the

removal of obstructions or hazards.  Nor could the FAA place such a condition on the receipt of

federal funds, for Goodspeed does not receive any.  Thus, any potential threat to Goodspeed's

continued licensed operation must come from the DOT's exercise of its authority to revoke

licenses for the failure to "maintain[] or use[]" the Airport "in accordance with" Connecticut's

laws and regulations regarding aviation.  Conn. Gen. Stat. § 13b-49; *see also* Conn. Agencies Regs. § 15-41-27.

From the record, it appears that the closest that DOT has come to revoking Goodspeed's license was in the late 1970s and early 1980s.  *See* Trial Ex. 6.  In a letter dated May 2, 1977, which was sent to a former manager of Goodspeed, the DOT made four "recommendations" for the continued safe operation of the Airport.  Chief among them was to "[r]epair or resurface [the] runway and ramp pavement."  *See id.* (Letter dated May 8, 1978).  Also of concern were broken runway lights and an aircraft that was parked in a location that made it an obstruction to the primary surface.  *See id.*  The final recommendation was to "[r]emove or lower trees to the south," which the DOT had determined constituted obstructions to the approach surface.  *See id.* As to this recommendation, however, the letter noted that "If [removing or lowering the trees] is a problem, you may want to consider a displaced threshold.  If you choose this alternative, we would be glad to work with you in determining the proper distance and markings."  *Id.*  The letter concluded by warning Goodspeed that if the recommendations were not carried out by the subsequent inspection, the Airport's license would be revoked.  *See id.*

A letter sent the following year, after another inspection of the Airport, reveals that while the problems with the runway surface had been addressed (albeit inadequately), the trees remained the same height.  *See* Trial Ex. 6 (Letter dated May 8, 1978) ("As in the past, the broken and/or loose asphalt on the runway and ramp area still remains to be most serious [problem]. . . . The Department feels that this condition constitutes a serious hazard to aircraft and their occupants.").  The 1978 letter also ended with the admonition that "if these substandard conditions are allowed to continue, you may jeopardize the license to operate the Goodspeed Airport."  *See id.*  The record is silent as to the next few years, but in a letter dated June 20, 1983,

23

the DOT again warned Goodspeed that the condition of its runway surface, in particular, could jeopardize the Airport's license.  *See* Trial Ex. 6 (letter dated June 20, 1983).  As with the 1977 letter, both the 1978 and the 1983 letters suggested that Goodspeed consider a displaced threshold if it could not lower or remove obstructing trees.

Although not discussed during the testimony, sometime prior to an inspection on April 11, 1984, Goodspeed did, in fact, adopt a displaced threshold of 340 feet at its runway's southern end.  *See* Trial Ex. 23 (DOT Landing Area Inspection Report dated April 11, 1984).  With the displaced threshold installed, the approach ratio was returned to a 20-to-1 ratio.  *See id.*  DOT Landing Area Inspection Reports from 1985 and 1988-1991 also state that the threshold of the southern runway was displaced.[9]   *See* Trial Exs. 7, 9a, 23-26.   The DOT Landing Area Inspection report from 1992 does not mention a displaced threshold, *see* Trial Ex. 27, and the Airport does not utilize one today, but the record is silent as to why the displaced threshold was abandoned.

In the ordinary case, of course, an airport owner is generally free to remove or lower trees that are on airport property without an order from DOT.  In this case, however, the parties have stipulated that the trees at Goodspeed Airport, including those that constitute Part 77 obstructions, are located within wetlands protected by the State of Connecticut through the Wetlands Act, Conn. Gen. Stat. §§ 22a-36 through 22a-45, and the CEPA, Conn. Gen. Stat. §§ 22a-14 through 22a-20.  *See* Joint Trial Mem. [doc. # 96] ¶¶ 13-14.  Under Conn. Gen. Stat. §22a-42, the East Haddam Wetlands Commission is charged with administering the Wetlands Act within East Haddam.  *See* Joint Trial Mem. [doc. # 96] ¶ 3.  As a consequence, before undertaking any "regulated activity" within the wetlands – including removing trees and other

---

[9] The parties did not submit any records from 1986 and 1987.

vegetation, *see* Conn. Gen. Stat. §§ 22a-38(13) – Goodspeed is required to obtain a permit from the East Haddam Wetlands Commission.  *See* Conn. Gen. Stat. § 22a-42a.  The failure to secure a permit before undertaking regulated activity is punishable by a fine.  *See id.* § 22a-42g; *Ventres v. Goodspeed Airport*, 275 Conn. 105, 150 (2005).   Additionally, removing trees or other vegetation from protected wetlands can constitute "pollution" and/or "destruction" of the wetlands under the CEPA, which grants standing to a variety of individuals to bring claims for equitable relief against the responsible individual(s).  *See* Conn. Gen. Stat. § 22a-16; *Rocque v. Mellon*, 275 Conn. 161, 170 (2005).

It is undisputed that no one affiliated with Goodspeed has applied to the Wetlands Commission for a permit to remove any trees or vegetation on Airport property.  Therefore, it is not possible to speculate as to how the Wetlands Commission would treat such an application. However, Mr. Ventres testified that the Wetlands Commission has granted permits to applicants wishing to cut or trim certain trees within protected wetlands in the past.  Goodspeed has not produced any examples of the Wetlands Commission denying a permit request outright, and Mr. Ventres testified that, in his experience, the Wetlands Commission has *never* done so.  That is to say, by its history, the Wetlands Commission does not have a flat prohibition on all trimming or cutting of trees in protected wetlands.  In fact, the record suggests that the Wetlands Commission (through its enforcement officer, Mr. Ventres) allowed Goodspeed to trim trees and vegetation in the protected wetlands on numerous occasions in the past, apparently without a permit and without consequence (at least until Goodspeed went beyond merely trimming).  *See, e.g.*, DOT Landing Area Inspection Report of Oct. 23, 1994, Ex. J to Trial Ex. 9a (noting that "ea[ch] winter [airport] operator cuts back brush" near the runway's southern end); *Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105, 114-15 (2005) (affirming the trial court's holdings that Goodspeed

Airport had acquired a prescriptive easement to trim trees on adjacent property, but that the Airport had impermissibly exceeded the scope of that easement by clear-cutting the land).  Based on the record presented, the Court finds no evidence that the Wetlands Commission would prohibit all trimming or removal of the obstructing trees, although it may impose conditions on such activity to ameliorate damage to the protected wetlands.

While Mr. Mellon testified that he believes that the Airport's license remains under an implicit threat – that either he lower the obstructing trees or the DOT would revoke the license – the record does not support this supposition.  The results of all of the many inspections of Goodspeed after 1983 do not contain any suggestion whatsoever that the Airport's license is in danger of revocation, even while the trees have continued growing and have reduced the approach to the runway's southern end to a 7-to-1 ratio.  *See* Trial Exs. 7, 23-30.  Moreover, the DOT letters from 1977, 1978 and 1983 are all explicit that the primary threat to Goodspeed's license was the poor condition of its runway, and *not* any Part 77 obstructions.  *See* Trial Ex. 6. To be sure, many of the more recent DOT Landing Area Inspection Reports recommend that Goodspeed continue to trim the surrounding vegetation – as it clearly had been doing, and which it could potentially resume with the permission of the Wetlands Commission – but none of the Inspection Reports suggests that the Airport's license is in any danger if it did not do so, even as the trees continued to encroach further and further into the imaginary surfaces established by Part 77.  Finally, and not insignificantly, both Goodspeed's expert on airport safety, Mr. Downar, and the pilot with presumably the most experience flying into and out of Goodspeed Airport, Mr. Rutledge, testified that the Airport is not unsafe.  Indeed, Mr. Rutledge testified that he has every intention of continuing to base the operation of Action Airlines – the only "air carrier" currently operating out of Goodspeed – at the Airport into the foreseeable future.  On the basis of the

evidence presented, the Court finds that the obstructing trees that Goodspeed wishes to lower or remove do not pose a present-day threat to its continued operation as an airport.[10]

## CONCLUSIONS OF LAW

Goodspeed has brought claims of field preemption and express preemption only.  First, it argues that because the Wetlands Act and the CEPA regulate the removal of obstructions in navigable airspace, they are facially preempted by the Federal Aviation Act and the Part 77 regulations promulgated thereunder.  *See* Pl.'s Pre-Trial Br. [doc. # 107] at 21-24.  Second, Goodspeed argues that the express preemption clause of the federal Airline Deregulation Act (ADA) applies to invalidate the two state statutes because they have an impermissible effect on air carriers utilizing the airport.  *See id.* at 24.  Goodspeed is not pursuing any claim of conflict preemption in this case, and therefore the Court expresses no view on that subject.  However, as is explained below, the Court disagrees with Goodspeed, and holds that the neither the Wetlands Act nor the CEPA is either field preempted or expressly preempted.

### A.    Implied (Field) Preemption

The Supremacy Clause of the United States Constitution, article VI, clause 2, declares that "the laws of the United States . . . shall be the supreme law of the land," thereby "invalidat[ing] state laws that interfere with, or are contrary to, federal law."  *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008) (internal quotation marks and citation omitted) (hereinafter, "*ATA*").  When considering a claim of federal preemption, a court's principal focus is discerning whether Congress intended to displace an area of state law.  *See*

---

[10] The Court emphasizes that it does not believe that this finding of fact is relevant to Goodspeed's field preemption claim, but it does bear on the argument that the Wetlands Act and CEPA are expressly preempted by the Airline Deregulation Act, as discussed *infra*.

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983).

Congressional intent to preempt state law can be either express or implied.  *See, e.g.*, *ATA*, 520 F.3d at 220–21.  Express preemption, discussed in the next section, is present when "a federal statute expressly directs that state law be ousted."  *Id.* at 220.  Implied preemption comes in two varieties, known as field preemption and conflict preemption.  Conflict preemption arises when state law "actually conflicts with federal law," *id.* at 220, such that it is not possible to comply with both and "state law stands as an obstacle to the accomplishment" of the congressional objective.  *Hillsborough County v. Automated Med. Labs. Inc*., 471 U.S. 707, 713 (1985).  Field preemption, on the other hand, is present under circumstances where it is clear that Congress intended for its regulation of a particular area (or "field") to be the *only* regulation, to which states and localities may not add or detract.  *See ATA*, 520 F.3d at 221.  Courts infer the presence of this congressional intent when "the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where the object sought to be obtained by the federal law and the character of obligations imposed by it . . .  reveal the same purpose."  *Id.* (*quoting Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988)) (internal quotations omitted).

Goodspeed's field preemption argument is based on the Federal Aviation Act, 49 U.S.C. § 40101 *et seq.*, and the FAA's regulations on obstructions, codified at 14 C.F.R. Part 77.  The task of this Court, then, is two-fold: first, to determine whether Congress intended to occupy the entire field of aviation safety, as Goodspeed argues; and, if so, to determine whether the Wetlands Act and the CEPA are within the scope of the preempted field.  As explained below,

28

the Court answers the former question in the affirmative, but reaches the opposite conclusion with regard to the latter.

The Second Circuit has apparently never held explicitly that Congress intended to occupy the entire field of air safety. However, it has strongly implied (in *dicta*) that it would so hold in *ATA*. *See* 520 F.3d at 225. In that opinion, the Second Court noted the general consensus in other Circuits that have reached this question. *See id.* (collecting cases); *see also Montalvo v. Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007) (holding that the federal government has occupied the entire field of aviation safety); *Greene v. B.F. Goodrich Avionics Sys., Inc.,* 409 F.3d 784, 795 (6th Cir. 2005) (same); *Abdullah v. Am. Airlines, Inc.,* 181 F.3d 363, 367-68 (3d Cir. 1999) (same); *French v. Pan Am Express, Inc.,* 869 F.2d 1, 5 (1st Cir. 1989) (same); *Tweed-New Haven Airport v. Town of East Haven*, 582 F. Supp. 2d. 261, 268 (D. Conn. 2008) ("[B]y the passage of the [Federal Aviation Act], Congress intended to occupy the entire field of airline safety, including runways.").

Congressional intent to preempt state law can be discerned from a number of sources, including the language of the statute at issue, "the 'statutory framework' surrounding it," and "the 'structure and purpose of the statute as a whole,' as revealed . . . through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (citations omitted). Where, as here, "Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute," courts should also consider the purpose of those regulations "as part of the pre-emption analysis." *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 149 (1986); *cf. Fidelity Fed. Sav. & Loan Ass'n v.*

*De la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less preemptive effect than statutes.").

However, when attempting to ascertain the intent of Congress, and particularly when considering an area that "the States have traditionally occupied[,]. . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624 (1973) (quoting *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1944)). This presumption applies not just in determining "whether Congress intended any pre-emption at all," but also to "questions concerning the *scope* of its intended invalidation of state law." *Lohr*, 518 U.S. at 485. "As a result, any understanding of the scope of a pre-emption statute must rest primarily on 'a fair understanding of *congressional purpose*.'" *Id.* at 485-86 (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 530, n.27 (1992)); *see also id.* at 485 ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case.") (citation omitted). This presumption against finding federal preemption except in cases where Congress has spoken clearly is borne of concerns for federalism; it ensures the "placement of the power of pre-emption squarely in the hands of Congress, which is far more suited than the Judiciary to strike the appropriate state/federal balance (particularly in areas of traditional state regulation)." *Geier v. Am. Honda Motor Co*., 529 U.S. 861, 907 (2000) (Stevens, J., dissenting).

Determining the *scope* of federal preemption – that is, deciding whether it encompasses a particular state action – requires consideration of both the state law's *purpose* and its *effect*. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 84 (1990) ("[P]art of the pre-empted field is defined by reference to the purpose of the state law in question, [and] another part of the field is defined by the state law's actual effect . . . ."); *see also Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88,

105 (1992) ("In assessing the impact of a state law on the federal scheme, we have refused to rely solely on the [state] legislature's professed purpose and have looked as well to the effects of the [state] law. . . . The key question is thus at what point the state regulation sufficiently interferes with federal regulation that it should be deemed pre-empted . . . ."); *United States v. Locke*, 529 U.S. 89, 115 (2000) ("The appropriate inquiry still remains whether the purposes and objectives of the federal statutes, including the intent to establish a workable, uniform system, are consistent with concurrent state regulation.").

With these principles in mind, and mindful of the Supreme Court's warning that "prior cases on preemption are not precise guidelines . . . , for each case turns on the peculiarities and specific features of the federal regulatory scheme in question," *City of Burbank*, 411 U.S. at 638, the Court now turns to consideration of the laws at issue here.  To begin, the Court agrees that the Federal Aviation Act evidences a clear congressional intent to occupy the entire field of aviation safety to the exclusion of state law.  The Federal Aviation Act declares that "The United States Government has exclusive sovereignty of airspace of the United States," 49 U.S.C. § 40103(a)(1), and directs the FAA Administrator to "develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace."  *Id*. § 40103(b)(1); *see also id.* § 40103(b)(2).   "Navigable airspace" is defined broadly as "airspace above the minimum altitudes of flight prescribed by regulations . . . , including airspace needed to ensure safety in the takeoff and landing of aircraft."  *Id*. § 40102(a)(32).   The primary purpose of the Federal Aviation Act is safety through the "creat[ion] and enforce[ment of] one unified system of flight rules."  *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007) (citation omitted).  As Congress explained in passing the Federal Aviation Act in 1958:

31

> [A]viation is unique among transportation industries in its relation to the federal
> government – it is the only one whose operations are conducted almost wholly
> within federal jurisdiction, and are subject to little or no regulation by States or
> local authorities. Thus, the federal government bears virtually complete
> responsibility for the promotion and supervision of this industry in the public
> interest.

*Big Stone Broad., Inc. v. Lindbloom*, 161 F. Supp. 2d 1009, 1016 (D.S.D. 2001) (quoting S. Rep.
No. 85-1811, at 5 (1958)).

Accordingly, the Secretary of Transportation is charged with "assigning and maintaining
safety as the highest priority in air commerce."  49 U.S.C. § 40101(1).  In response to this
congressional mandate, the FAA has established a comprehensive regulatory scheme "addressing
virtually all areas of air safety," *ATA*, 520 F.3d at 224, including the certification of aircraft, most
airports, pilots and mechanics; air traffic control systems; air navigation and communication; and
airspace classifications.  *See generally* 14 C.F.R. Parts 21-193; *see also Air Line Pilots Ass'n,
Int'l v. Quesada*, 276 F.2d 892, 897 (2d Cir. 1960) ("[T]he legislative history of the Federal
Aviation Act and the practice under prior law show that Congress intended the Administrator to
have broad power to establish safety rules for the nation's airways . . . .").

However, while the conclusion that Congress intended to occupy the entire field of
aviation safety is a necessary condition for the success of Goodspeed's field preemption
argument, it is not sufficient.  The essence of Goodspeed's argument is that since the trees it
wishes to remove penetrate "navigable airspace," over which the federal government has
exclusive dominion, Connecticut is powerless to interfere in any way with whatever the Airport
wishes to do to remove or lower the trees.  The scope of Congress's preemption of state law does
not necessarily sweep this broadly.  Courts have long distinguished between state laws that

32

directly affect aeronautical safety, on the one hand, and facially neutral laws of general application that have merely an incidental impact on aviation safety.

Logically, there must be a limit to the preemptive effect of federal law, even in an area, like aeronautical safety, where Congress has expressed an intention to occupy the "entire" field. Otherwise, a virtually unlimited number of state and local laws and regulations that might conceivably touch upon the operation of airports, even to a negligible degree, could be said to have *some* impact on aviation safety, assuming one is willing to retreat far enough up the chain of causation. As Supreme Court has repeatedly emphasized, the limiting principle is the intent of Congress. *See Lohr*, 518 U.S. at 485-86. Consideration of the issues raised by this case, and application of the presumption against finding federal preemption of state laws on health and safety, leads inexorably to the conclusion that neither the Wetlands Act nor the CEPA fall within the preemptive scope of federal law regulating aviation safety.

The state laws challenged by Goodspeed – environmental laws that make no reference whatsoever to aviation or aviation safety – are certainly deserving of the presumption against preemption. Neither statute expresses any intent to directly regulate airport operations or aeronautical safety. Instead, the Wetlands Act was passed to prevent a variety of deleterious effects brought about by the unregulated use of Connecticut's wetlands and watercourses – "an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed" – that were occurring through the "deposition, filling or removal of material, the diversion or obstruction of water flow, the erection of structures and other uses, all of which have despoiled, polluted and eliminated wetlands and watercourses." Wetlands Act, Conn. Gen. Stat. § 22a-36 ("Legislative finding"). The CEPA evidences a complementary intent to protect the "public trust in the air, water and other natural resources of the state of

33

Connecticut."  CEPA, Conn. Gen. Stat. § 22a-15 ("Declaration of policy").  *Cf. Skysign Int'l, Inc. v. City and County of Honolulu*, 276 F.3d 1109, 1116 (9th Cir. 2002) (granting Hawaii's general signage ordinance the benefit of the presumption against preemption, but declining to do so in regards to its *aerial* signage ordinance because the latter "specifically targets for regulation 'an area where there has been a history of significant federal presence,' i.e., navigable airspace.") (quoting *Locke*, 529 U.S. at 108).

Goodspeed has not argued, and nor could it, that Congress's intent in enacting the Federal Aviation Act was to preempt all state laws, such as these, whose express purpose are environmental protection.  Rather, Goodspeed argues that, in this case, "[t]he relevant inquiry is whether the *effect* of the state law is such that it impacts the field of air safety and aircraft operations."  Pl.'s Resp. Br. [doc. # 111] at 5 (emphasis in original).  The crux of Goodspeed's argument is that "state environmental laws that prohibit the removal of obstructions to air navigation, obstructions which are situated directly at the end of a runway, surely have an effect on air safety and aircraft operations, two areas solely within the province of the federal government," and are thereby preempted.  *Id.*

While Goodspeed is no doubt correct that, in the abstract, state laws that prohibit the removal of such obstructions would "have an effect on air safety and aircraft operations," Goodspeed's argument suffers a fatal flaw.  The argument is misleadingly premised on "state environmental laws that *prohibit* the removal of obstructions to air navigation."  *Id.* (emphasis added).  But neither the Wetlands Act nor the CEPA contains such a prohibition.  Rather, the Wetlands Act merely requires that Goodspeed obtain a permit before attempting to remove or trim the trees in question.  *See* Conn. Gen. Stat. § 22a-42a.  The statute contains no outright prohibition on undertaking regulated activity, and as Mr. Ventres testified, the East Haddam

34

Wetlands Commission has never applied the law in that manner.  Similarly, the CEPA simply prohibits the Airport from "unreasonabl[y] pollut[ing], impair[ing] or destr[oying]" the "air, water and other natural resources of the state."  Conn. Gen. Stat. § 22a-16.  Thus, the "relevant inquiry" is not as Goodspeed presents it, but rather, whether state environmental laws that impose a permitting requirement on the removal of trees in protected wetlands and prohibit unreasonable environmental degradation are field preempted by federal law that is meant to ensure aviation safety.  Presented appropriately, the answer to this question is certainly "no."

There is nothing in the text or legislative history of the Federal Aviation Act that even hints at the congressional intent that Goodspeed asserts can be found therein.  For sure, Congress intended that safety be "the highest priority in air commerce."  49 U.S.C. § 40101(1).  But accepting Goodspeed's field preemption argument would require the conclusion that Congress intended to completely eviscerate all attempts by states to protect their own environmental integrity whenever those attempts would have an indirect, incidental, or even speculative impact on the operations of an airport within its boundaries.  In this case, it would mean Congress intended to preempt state wetlands protections regardless of whether, for example, the protected trees pose an actual threat to air safety and/or the Airport's continued operation, and regardless of the impact Goodspeed's actions may have on the surrounding environment.  There is absolutely no indication that this is what Congress intended when it passed the Federal Aviation Act – and nor would Congress have needed to intend such a dramatic alteration of the federal/state balance of power to effectuate its purpose in passing the Act.  Rather, it is much more consistent with the values inherent in our federal system for Congress to have intended for its regulation of aviation safety to preempt only those state laws that either a) have the purpose or effect of directly regulating an aspect of air safety; or b) are actually shown, on an as-applied basis, to impact the

35

unified regulation of air safety.  The Court has already explained that the state laws at issue here do not have the purpose of directly regulating any aspect of air safety, and Goodspeed has not shown that the permitting requirement of the Wetlands Act or the CEPA's prohibition on environmental degradation have that impermissible effect, either.  Therefore, since Goodspeed has chosen not to bring an as-applied challenge, there is no basis for concluding that either state law is preempted.

This holding is supported by the conclusions other courts have reached in adjudicating similar cases.  For example, in *City of Burbank v. Lockheed Air Terminal, Inc.*, the Supreme Court held that with the passage of the Federal Aviation Act and the Noise Control Act, 49 U.S.C. § 1431 *et seq.*, Congress occupied the entire field of aircraft noise regulation, thereby invalidating the City of Burbank's attempt to curtail aircraft noise by placing curfews on aircraft flights at the Holloway-Burbank Airport.  *See* 411 U.S. 624 (1973).  The Court found that "the pervasive nature of the scheme of federal regulation of aircraft noise  . . . leads us to conclude that there is pre-emption" of the City's ordinance – which was an unabashed attempt to directly regulate in the very same field addressed by Congress.  *Id.* at 634.  The Supreme Court explained that "If we were to uphold the Burbank ordinance and a significant number of municipalities followed suit, it is obvious that fractionalized control of the timing of takeoffs and landings would severely limit the flexibility of FAA in controlling air traffic flow."  *Id.* at 639; *see also Pirolo v. City of Clearwater*, 711 F.2d 1006, 1008-09 (11th Cir. 1983) (following *Burbank* to hold that city ordinances regulating night operations and setting air traffic patterns were preempted); *Price v. Charter Township of Fenton*, 909 F. Supp. 498, 505 (E.D. Mich. 1995) (same, with regard to other noise-control measures).

While ultimately deciding the case only on express preemption grounds, the Second Circuit in *ATA* expressed a similar concern over "fractionalized control," noting that were it to uphold the State of New York's Passenger Bill of Rights – which required airlines to provide food, water, electricity, and restrooms to passengers during lengthy ground delays – that would mean that "another state could be free to enact a law prohibiting the service of soda on flights departing from its airports, while another could require allergen-free food options on its outbound flights, unraveling the centralized federal framework for air travel." *ATA*, 520 F.3d at 225. The Ninth Circuit used the same logic to find preempted a state law claim that would have required airlines to warn passengers about the dangers of deep-vein thrombosis during long flights, explaining that "If the FAA did not impliedly preempt state requirements for passenger warnings, each state would be free to require any announcement it wished on all planes arriving in, or departing from, its soil." 508 F.3d at 473. Other cases have similarly found preemption where a state or locality's regulation, if adopted on a more widespread basis, would significantly undermine the efforts of the FAA to provide ensure a unified system of air regulation. *See, e.g.*, *Abdullah*, 181 F.3d at 372 (finding, in a case brought by passengers claiming that the airline provided insufficient warnings of turbulence that resulted in the passengers being injured, that "because of the need for one, consistent means of regulating aviation safety, the standard applied in determining if there has been careless or reckless operation of an aircraft[ ] should be federal; state or territorial regulation is preempted"); *French*, 869 F.2d at 6 (finding Rhode Island's attempt to regulate airline pilot drug testing was preempted by the FAA's own regulation on the matter, and explaining that holding otherwise would result in "a patchwork of state laws in this airspace, some in conflict with each other, [that] would create a crazyquilt effect").

Upholding the state laws challenged here, by contrast, would risk no such "fractionalized" control" of any aspect of air safety by the FAA, particularly since airport operators are free to bring as-applied challenges based on an actual conflict between the state laws and the objectives of the Federal Aviation Act.  On this point, the Court finds instructive the actions of the FAA in dealing with the evidently common challenge posed by tree obstructions at airports.  *See R.J. Reynolds Tobacco Co.*, 479 U.S. at 149 (instructing courts to consider agency regulations as part of the field preemption analysis).  Rather than ordering that trees be removed – even at airports that it is statutorily-authorized to license – the FAA only requires that the obstructions be noted and/or studied so that pilots can be given appropriate notice.  To be sure, the FAA does occasionally condition federal funds or licenses on an airport taking steps to remediate obstructions, but it generally relies on the notice provisions, together with "moral suasion," to bring about compliance with its guidelines on obstructions.  *Air Line Pilots' Ass'n Int'l*, 446 F. 2d at 240.

Although the Court does not doubt that trees as obstructions do pose a risk to aircraft, the FAA's relatively restrained attempts at regulating the presence of trees supports the conclusion that requiring airport owners to get a permit to remove trees does not unduly undermine the federal government's regulation of airport safety.  *See English*, 496 U.S. at 84 ("[P]art of the pre-empted field . . . is defined by the state law's actual effect . . . .").  To put it another way, were other states to adopt laws identical to the Wetlands Act and the CEPA, there is no evidence that the result would be "fractionalized control" of air safety that concerned the Supreme Court in *Burbank*.  In fact, a number of states *do* have laws quite similar to those at issue here, and Mr. Downar testified that he has worked with local bodies like the Wetlands Commission to obtain permission to undertake regulated activity at other airports in the region.

38

Nonetheless, and as a testament to the flexibility of our federal system, examining courts have generally found that these laws regulating land use can co-exist with federal aviation law – at least in regards to principles of field preemption – so long as neither their purpose nor their effect encroaches into the field of airspace management or safety. *See, e.g.*, *Gustafson v. City of Lake Angelus*, 76 F.3d 778, 784 (6th Cir. 1996) (finding the Federal Aviation Act did not preempt a municipality exercising its authority to regulate the creation of new airports because "the designation of plane landing . . . is a matter left primarily to local control," and noting that "[t]he FAA has acknowledged that land use matters within the federal aviation framework are intrinsically local"); *Condor Corp. v. City of St. Paul,* 912 F.2d 215, 219 (8th Cir. 1990) (same holding); *Hoagland v. Town of Clear Lake*, 344 F. Supp. 2d 1150, 1154 (N.D. Ind. 2004) (same); *Faux-Burhans v. County Comm'rs of Frederick County*, 674 F. Supp. 1172, 1173-74 (D. Md. 1987) (holding that county zoning regulations that affect private airfield management are not preempted by federal law because they do not affect flight operations within navigable airspace, and noting that "no federal law gives a citizen the right to operate an airport free of local zoning control"), *aff'd*, 859 F.2d 149 (4th Cir. 1988); *Dallas/Fort Worth Int'l Airport Bd. v. City of Irving*, 854 S.W.2d 161, 167-68 (Tex. Ct. App. 1993) (holding that local zoning laws were not preempted by an established airport's attempt to expand by acquiring adjacent land); *see also Skysign,* 276 F.3d at 1117 (holding that the Federal Aviation Act does not "preclude local regulation . . . that does not actually reach into the forbidden, exclusively federal areas, such as flight paths, hours, or altitudes").

Goodspeed relies heavily on a recent decision of a colleague, District Judge Janet Hall, which held that the actions of the Town of East Haven, Connecticut's Inland Wetlands and Watercourse Commission, Planning and Zoning Commission, and Flood and Erosion Control

39

Board in trying to obstruct the construction of runway safety areas ("RSAs") at Tweed-New Haven Airport were impliedly preempted by federal aviation law. *See Tweed*, 582 F. Supp. 2d. at 268.   That case, however, is easily distinguishable from this one.   As an airport serving regularly-scheduled air carrier operations utilizing aircraft carrying more than nine passengers, the Tweed-New Haven Airport is required to hold an operating certificate issued by the FAA under Part 139.  *See* 14 C.F.R. Part 139; *see also* 49 U.S.C. § 44706(a)(2).   Under Part 139, Tweed-New Haven is under a clear obligation to have RSAs acceptable to the FAA.  *See* 14 C.F.R. § 139.309(a).   At the time the complaint was filed in *Tweed*, the airport did not have acceptable RSAs.  *See Tweed*, 582 F. Supp. 2d at 264.   But with substantial assistance from the FAA, Tweed-New Haven Airport updated its "Master Plan" to provide for the construction of the RSAs over a number of years.  *See id.*   The updated Master Plan called for certain activities to be undertaken within protected wetlands and for the preparation of an Environmental Impact Statement, which the FAA published in 2000.  *See id.* at 264-65.   Tweed-New Haven Airport's plan for the construction of the RSAs included substantial wetlands and tidal wetlands mitigation, and the entire plan was thoroughly vetted and approved by a variety of state and federal agencies, including the FAA, the Army Corps of Engineer, the federal Environmental Protection Agency, the Federal Emergency Management Agency, the Connecticut Office of Policy and Management, the Connecticut DOT, and the Connecticut DEP.  *See id.* at 265. Moreover, 95 percent of the RSA construction costs, totaling more than $20 million, were to be funded by a grant awarded to the airport by the FAA through the Airport and Airway Improvement Act, 49 U.S.C. 2215 *et seq*.  *See Tweed*, 582 F. Supp. 2d at 265.   Under these circumstances, Judge Hall held that the municipal defendants could not use their local authority to obstruct the "federally-mandated, federally-funded, and state- and federally-approved, aviation

40

safety and air navigation project."  *Id.* at 263, 270.  Crucial to Judge Hall's holding was that the FAA *required* the construction of the RSAs under the Part 139 regulations.  *See id.* at 270.

In this case, and in stark contrast to *Tweed*, there is no federal or state mandate; no federal funding; and no federal or state approval for the lowering or removal of any of the obstructing trees at Goodspeed Airport.  Instead, Goodspeed contends that even though the FAA has no authority to license the Airport or to order it to remove the trees, as soon as a tree at the Airport grows tall enough that it penetrates one of the imaginary surfaces established by the notice provisions of Part 77, that tree's growth preempts the Wetlands Act and the CEPA such that Goodspeed can – without any federal, state or local agency oversight or approval – cut the tree to the ground if it so chooses, and to do so in any manner that Goodspeed sees fit.  There is no basis in law or in the evidence in this case to support such an assertion.  Therefore, the Court holds that, at least in the particular circumstances of this case – which involves trees located in protected wetlands at Goodspeed Airport – the Wetlands Act and the CEPA are not field preempted by federal law on air safety.

## B.    Express Preemption

Goodspeed's argument that the Wetlands Act and the CEPA are expressly preempted, at least insofar as they regulate the removal of trees that are "obstructions," is based on the Airline Deregulation Act (ADA).  Prior to passage of the ADA, the Civil Aeronautics Board, a federal agency, exercised exclusive control over pricing in the airline industry.  With passage of the ADA in 1978, Congress sought to improve the service and efficiency of the airline industry through deregulation and increased market competition amongst air carriers.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992).  The ADA's express preemption clause was included "[t]o ensure that the States would not undo [this] deregulation with regulation of

their own."  *Id.*  The ADA's express preemption clause, found at 49 U.S.C. § 41713(b)(1), states in relevant part:

> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

It is worth emphasizing that it is the effect on the "price, route or service" of an air *carrier* – not an airport – that is prohibited by the ADA.  The act defines an "air carrier" as "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation" as a common carrier for compensation.  49 U.S.C. §§ 40102(2), (5), (23), (25). The only "air carrier" that Goodspeed has identified as utilizing the Airport at present is Mr. Rutledge's company, JIB, Inc., which does business as Action Airlines.

Express preemption arises when "a federal statute expressly directs that state law be ousted," *ATA*, 520 F.3d at 220 (quoting *Ass'n of Int'l Auto. Mfrs. v. Abrams,* 84 F.3d 602, 607 (2d Cir.1996)), which the ADA no doubt does.  The inclusion of the "related to" language in the express preemption clause has been interpreted expansively to preempt even state laws that have an "indirect" effect on rates, routes, or services.  *See Morales,* 504 U.S. at 384.  In *Morales*, the Supreme Court construed the ADA's preemption clause *in pari materia* with the preemption provision of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1144(a), and concluded that "[s]tate enforcement actions having a connection with, or reference to airline 'rates, routes, or services' are pre-empted."  *Morales*, 504 U.S. at 383-84.  In applying this interpretation to invalidate the state consumer fraud statute at issue, the Court held that the requisite connection exists where the law has a "forbidden significant effect" upon the price, route or services of an air carrier.  *Id.* at 388.  The Court emphasized, however, that while merely

"indirect" effects of a state law *can* be enough to find express preemption, there are limits: the impact of some state actions would have an effect that is "too tenuous, remote, or peripheral to have pre-emptive effect." *Id.* at 390 (citation and quotation marks omitted).

More recently, in *Rowe v. New Hampshire Motor Transport Association*, the Supreme Court construed an analogous express preemption clause in the Federal Aviation Administration Authorization Act to find that a Maine tobacco law that required ground motor carriers to provide specific delivery services was preempted because it had a "'direct connection' with motor carrier services and created a 'significant' and adverse 'impact'" on the federal objective in preempting state laws regulating motor carriers – i.e., letting market forces determine the services offered.   *See* 128 S.Ct. 989, 995-96.   Here again, however, the Supreme Court emphasized that "federal law does not pre-empt state laws that affect rates, routes, or services in 'too tenuous, remote, or peripheral a manner,'" and that "the state laws whose 'effect' is 'forbidden' under federal law are those with a '*significant* impact' on carrier rates, routes, or services."  *Id.* at 997 (quoting *Morales*, 504 U.S. at 388, 390) (emphasis in original).

In applying the Supreme Court's precedent on the ADA's express preemption clause, the Second Circuit has cautioned that there is no bright-line test for determining which state laws are permissible and which are not; rather, the inquiry should proceed "on a case-by-case basis." *Abdu-Brisson v. Delta Air Lines*, 128 F.3d 77, 85-86 (2d Cir. 1997).  The Second Circuit's most recent pronouncement on the preemptive reach of the ADA was in *ATA*; there, it held that the New York Passenger Bill of Rights – which required airlines to provide to provide food, water, electricity, and restrooms to passengers during lengthy ground delays – directly "related to" the "services" of air carriers and was therefore preempted.  *See* 520 F.2d at 223.  The *ATA* Court explained that the law improperly "substitutes New York's commands for competitive market

forces, . . . threatening the same 'patchwork of state service-determining laws, rules, and regulations' that concerned the Court in *Rowe*." *Id.* at 223-24 (quoting *Rowe*, 128 S.Ct. at 996).

Goodspeed does not claim that either the Wetlands Act or the CEPA directly "relate to" or "reference" the "rates, routes, or services" of an air carrier. Nor could it. Rather, Goodspeed argues that by regulating the removal of obstructions at the Airport (trees), the state laws have a sufficient "connection" to – and have a "significant and adverse impact" on – the "rates, routes, or services" of air carriers. *See* Pl.'s Post-Trial Mem. [doc. # 116] at 17-18. Goodspeed, citing Mr. Stannard's testimony, argues that the DOT could revoke its license if obstructions make the airport unsafe. *See id.* at 18; Trial Ex. 9 [Stannard Dep.] at 120-21. Goodspeed then relies on Mr. Rutledge's testimony to argue that if the Airport is closed, Action Airlines would have to utilize other area airports instead, which would increase the rates it charges customers. *See* Pl.'s Post-Trial Mem. [doc. # 116] at 18. Finally, the Airport argues that Mr. Rutledge's testimony suggested that at least one alternative to lowering the trees – installing a displaced threshold – could affect his operations as well, depending on the how much the threshold was displaced. *See id.* Either outcome – closing the Airport or using a displaced threshold – Goodspeed argues, would have the requisite "significant and adverse impact" on the "rates, routes, or services" of an air carrier necessary to find express preemption. *See Morales*, 504 U.S. at 388.

The Court disagrees. Not only would the state laws' impact on Mr. Rutledge's operations be indirect, but they are entirely speculative and, in fact, unsupported by the evidentiary record. Although it is no doubt true that the loss of Goodspeed's operating license would have an impact on Action Airlines, the Airport has presented no evidence to suggest that the obstructing trees are actually jeopardizing its operating license. First and most critically, the Airport has yet to seek a permit from the East Haddam Wetlands Commission to remove or trim the trees in question. If,

44

for example, the Wetlands Commission permits Goodspeed to remove or lower the trees such that they are no longer "obstructions" under Part 77, then obviously the state law would have *no* impact on the Airport's continued operation.   While Goodspeed may think this possibility remote, the Court credits Mr. Ventres' testimony in finding it probable that the Wetlands Commission would permit the Airport to undertake at least some of the trimming and cutting that it wishes to undertake, albeit under conditions that minimize harm to the environment.   This possibility alone is sufficient for the Court to hold that the state law is not preempted, at least on the record before it.   *See Abdu-Brisson*, 128 F.3d at 85-86 ("In possible preemption areas where common federal and state interests exist, courts should seek, if possible, some reasonable and uniform accommodation which does not frustrate either the full congressional purposes and objectives or state policies in determining the relationship between federal and state laws.").

Second, even if the Wetlands Commission were to forbid completely the Airport from undertaking any "regulated activity" – speculation that, again, is not supported by the evidentiary record – there is nothing in the record to support Goodspeed's claim that the obstructing trees have put its license in danger of revocation.   For example, Mr. Stannard merely reaffirmed the uncontroverted fact that the DOT has the authority to revoke an airport license if the airport is unsafe for continued operation.   *See* Trial Ex. 9 (Stannard Dep.) at 121; Conn. Gen. Stat. § 13b-49; Conn. Agencies Regs. § 15-41-27.   And while Mr. Stannard did testify that "obstructions to approach slopes to airport runways" are "a safety issue," Trial Ex. 9 (Stannard Dep.) at 121, he did *not* testify that the trees that constitute "obstructions" at Goodspeed are sufficiently serious to threaten the Airport's license.   In fact, Mr. Stannard conducted the 1999 inspection of Goodspeed Airport, during which he noted that obstructing trees at the Airport had reduced the approach slope to the runway to 7-to-1 (whereas 20-to-1 is the preferred slope), but he said nothing to

45

suggest that this jeopardized Goodspeed's license.  *See* Trial Ex. 7 (Letter dated Sept. 1, 1999 from Warren Stannard to Timothy Mellon).   He did recommend that the trees be removed to maximize the Airport safety, *see id.*, but in his deposition, he explicitly disavowed any authority for the DOT or the FAA to "trump the local regulatory boards with respect to work that needs to be done at an airport."  *See* Ex. 9 (Stannard Dep.) at 34; *see also id.* at 98 (testifying that he was not aware of any "state law or regulation or FAA regulation" giving him authority "to supercede local wetlands regulations").  Mr. Stannard testified that the recommendations "are exactly that, recommendations," that "it's up to the owner of the airport or the operator of the airport to figure out how to get the recommendation followed if he wants to," and that he did *not* believe that the failure to follow a recommendation to trim or remove trees would result in the Airport's closing. *See id.* at 98-99.

Moreover, the trees that Mr. Stannard recommended be removed in 1999 are still standing today, and the approach slope to Goodspeed's Airport remains at a 7-to-1 ratio.  And yet, the Airport's license was renewed by the DOT within the last eight months, which necessarily reflects the DOT's judgment that the Airport remains safe in its present condition – a judgment that was echoed by the testimony of both Mr. Rutledge and Goodspeed's expert on airport safety, Mr. Downar.  And, as discussed previously, the DOT letters from 1977, 1978, and 1983, all of which threatened the Airport's license for substandard conditions, are both far too remote in time and in subject matter to create a present-day threat to Goodspeed's license.  *See* Trial Ex. 8 (expressing primary concern for the dangerous condition of the surface of Goodspeed's runway).  Therefore, Goodspeed has not presented sufficient evidence to find that the state laws regulating the removal of obstructing trees at the Airport create *any* impact on the "rates, routes, or services" of an air carrier – much less an "adverse and significant" one.  *See*

46

*Morales*, 504 U.S. at 388; *see also Tweed*, 582 F. Supp. 2d at 268 (rejecting the airport's ADA express preemption argument, premised on the possibility that the FAA would revoke its license if it did not construct the RSAs, because "[w]hile it is true that impact on routes and service is a possibility, it is not clear from the record that the East Haven defendants' actions would definitely result in the FAA withdrawing the operating certificate").

Finally, Goodspeed's argument that the use of a displaced threshold in lieu of removing the trees would have a significant and prohibited effect on the "rates, routes, or services" of air carriers is similarly unpersuasive. Goodspeed submitted no evidence regarding the degree to which the threshold would have to be displaced to accommodate the presence of the trees, and therefore Mr. Rutledge's testimony that a displaced threshold *could* affect his operations, depending on how much shorter it made the runway, is simply too speculative to find that the impact would be significant. The record reflects that Goodspeed utilized a displaced threshold of as much as 340 feet for a number of years in the late 1980s and 1990s, and yet there is no evidence that this had an adverse effect on the "rates, routes, or services" of an air carrier (and Mr. Rutledge's company has operated out of the Airport since 1979). Mr. Mellon's testimony that he believes a displaced threshold may make the Airport unsafe is also not supported by the record. The fact that the Airport remained operational throughout the time period in which it had a displaced threshold necessary reflects the judgment of DOT that shortening the runway to that extent did not make the Airport unsafe, and there is no reason to think that DOT would not reach the same conclusion should Goodspeed reinstate the displaced threshold today. Moreover, Goodspeed has not even attempted to light the trees, which the testimony established would be another way of addressing the safety concerns created by the obstructing trees.

Again, the Court emphasizes that it is not advocating that Goodspeed or the East Haddam Wetlands Commission ignore the safety risks associated with the tree obstructions located at the Airport; indeed, the Court thinks it prudent for Goodspeed to work in a cooperative manner with the Wetlands Commission to address that subset of the obstructing trees that present the greatest threats to aircraft safety.  The Court merely holds that Goodspeed has not demonstrated that going through the Wetlands Commission's permitting process – or adhering to the state laws more generally – would have an adverse and significant impact on the "rates, routes, or prices" of an air carrier.  Accordingly, the state laws are not expressly preempted by the ADA.

### C.       Deference to the Federal Government

As mentioned previously, prior to trial, and with the blessing and aid of the parties, the Court requested the views of the federal government on Goodspeed's preemption arguments.  *See* Parties' Proposed Questions [doc. # 92]; Letter from the Court dated August 4, 2009 [doc. # 95]. Since the response to the Court's request arrived just a few days before trial, *see* Statement of Interest of the United States [doc. # 112] (hereinafter, the "Statement of Interest" or the "Statement"), the Court permitted the parties to submit post-trial briefs to address the substance of the Statement, as well as what deference, if any, the Court should afford it.  *See* Pl.'s Post-Trial Mem. [doc. # 116]; Defs.' Post-Trial Mem. [doc. # 117].  The Court should note that while it found the Statement of Interest to be superbly researched and reasoned, the outcome of this case would change no matter the degree of deference the Court affords the federal Government's views (if any).  Nonetheless, and for the sake of thoroughness, the Court addresses the issue of deference here.

The parties are in agreement that the Statement does not warrant *Chevron* deference, as it was not the result of formal agency rulemaking.  *See Chevron U.S.A., Inc. v. NRDC*, 467 U.S.

837, 844 (1984); *De La Mota v. U.S. Dep't of Educ.*, 412 F. 3d 71, 79 (2d Cir. 2004); *but see Big Stone Broad., Inc. v. Lindbloom*, 161 F. Supp. 2d 1009, 1019-20 (D.S.D. 2001) (granting *Chevron* deference to an FAA amicus brief regarding the preemptive effect of the Federal Aviation Act, albeit after the Court reached the same conclusion independently).   The Court agrees.

Defendants argue that the Statement of Interest ought to be afforded so-called *Skidmore* deference, under which the degree of deference afforded would depend on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also United States v. Mead Corp.,* 533 U.S. 218, 234-35 (2001); *In re New Times Secs. Servs., Inc*., 371 F.3d 68, 82-83 (2d Cir. 2004).   Defendants' position seems to be supported by the Second Circuit's recent actions in *New York State Restaurant Association v. New York City Board of Health et al.*, 556 F.3d 114, 130 (2d Cir. 2009).   There, prior to oral argument, the Second Circuit invited the federal Food and Drug Administration (FDA) to submit an amicus brief on a question of whether a municipal ordinance requiring certain restaurants to post calorie content information on their menus was preempted by the federal statutory scheme regulating labeling and branding.  *See id.*  The Court then granted *Skidmore* deference to the FDA's position articulated in its brief.  *See id.*

Goodspeed, however, advances several arguments for why the Statement of Interest is not worthy of *Skidmore* deference.   Beyond merely arguing that the Statement reaches the wrong conclusions, Goodspeed advances two primary challenges to affording it *Skidmore* deference. Both challenges are related to a letter submitted to the court in *Tweed*.   Neither argument is persuasive.

In *Tweed*, the airport plaintiff requested that Judge Hall either afford deference to or take judicial notice of a letter it submitted that had been written by the Assistant Chief Counsel of the FAA.   The letter, which the plaintiff had requested, argued that the actions of the defendants were preempted.   *See* FAA letter dated Aug. 22, 2008, *Tweed*, 582 F. Supp. 2d. 261 (D. Conn. 2008) (No. 08CV597, doc. # 89 Ex. 97); *see also* Pl.'s Post-Trial Br., *id.* (doc. # 101) at 72-75 (requesting that the court defer to or take judicial notice of the letter); Defs.' Post-Trial Br., *id.* (doc. # 106) at 60-61 (objecting).   Judge Hall, however, while ultimately agreeing with the letter's conclusion that field preemption principles precluded the municipal defendants' actions in attempting to stop the construction of the Runway Safety Areas, determined that the letter was not the proper subject of judicial notice because it did not meet the standard of Rule 201(d) of the *Federal Rules of Evidence*.  *See Tweed*, 582 F. Supp. 2d. at 266 n.8.   And while she did not specifically address the issue of deference, Judge Hall implicitly rejected plaintiff's argument that the letter was worthy of any deference, explaining that "there is nothing on the face of the letter reflecting that the letter is an opinion of the FAA. The court views this letter as an opinion letter written by an agency counsel which amounts to argument and hearsay."  *Id.*  Accordingly, Judge Hall refused to take judicial notice of the letter and gave it no weight.  *See id.*

Goodspeed argues that the Court should treat the Statement of Interest filed in this case in the same manner and for the same reasons.   *See* Pl.'s Post-Trial Mem. [doc. # 96] at 3-4.   But here again, critical differences between this case and *Tweed* warrant differential treatment.   First, the letter in *Tweed* apparently was requested by the plaintiff alone, without any input or even the knowledge of the Court or opposing counsel.   *See* Defs.' Post-Trial Br., *Tweed*, 582 F. Supp. 2d. 261 (D. Conn. 2008) (No. 08CV597, doc. # 106) at 60-61.   Moreover, it was submitted on the eve of trial and beyond the deadline for submitting trial exhibits.  *See id.*   Thus, the defendants

objected that submitting the letter at the eleventh hour was an attempt "to introduce expert testimony without timely (or any prior) notice and without the opportunity to cross-examine the offeror or to provide contrary expert testimony." *Id.* at 60. Under those circumstances, it was well within Judge Hall's sound discretion to decline to defer to what amounted to legal argument premised entirely upon inadmissible hearsay.

Here, by contrast, Goodspeed knew for months before trial that the Court would seek the opinion of the federal government on the Airport's preemption arguments. *See* Order dated June 23, 2009 [doc. # 88]. Goodspeed raised no objection, despite the opportunity to do so; indeed, Goodspeed's counsel agreed that the federal Government's opinion could be useful to the Court (and, presumably, to its case). *See* Minute Entry for June 23, 2009 Hearing [doc. # 89]. Moreover, all parties were permitted to submit proposed facts and questions to be submitted by the Court. *See* Parties' Proposed Questions [doc. # 92]. And while the parties could not agree on all of the relevant facts, the Court's letter to the U.S. Attorney's Office adopted Goodspeed's proposed facts nearly verbatim. *Compare id.* at 1-2; *with* Letter [doc. # 95]. The parties later agreed to stipulate to those same facts, among others, in their joint trial memo. *See* Joint Trial Mem. [doc. # 96] at 3-4. The situation here is thus far different from that in *Tweed*, where the FAA's letter was based solely on what had been represented to the agency by the plaintiff, with no opportunity for the court or the other parties to provide input.

Moreover, the submission of the letter in *Tweed* was essentially a partisan exercise. Rather than being an amicus brief or statement of interest submitted directly to the Court, it was sent to the plaintiff's attorneys, who were then free to disclose the letter – or not – depending on their judgment as to its utility in advancing its arguments. Indeed, had the letter expressed a contrary position as to the permissibility of the defendants' actions, the plaintiff would have been

51

within its rights to never disclose it at all.  Here, by contrast, the Statement of Interest was submitted directly to the Court upon its request, with to the parties' cooperation, and pursuant to a statutory provision that permits the Department of Justice to do so in order to represent the interests of the United States Government.  *See* 28 U.S.C. § 517.  Therefore, and unlike in *Tweed*, there "is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question."  *Auer v. Robbins*, 519 U.S. 452, 462 (1997).

Goodspeed's second argument against deferring at all to the Statement of Interest is that it expresses views inconsistent with those contained in the FAA's letter the plaintiff attempted to introduce in *Tweed*.  *See Skidmore*, 323 U.S. at 140 (explaining that one factor in the deference analysis is the agency's "consistency with earlier and later pronouncements").  But Goodspeed's argument is simply mistaken, for, as the Court explained above, there is nothing inconsistent with the conclusion that the actions of the municipal defendants in *Tweed* were preempted, but that those of the Defendants in this case are not.

Therefore, the Court rejects Goodspeed's challenges to granting *Skidmore* deference to the Statement of Interest.  Instead, and in accordance with the Second Circuit's example in *New York State Restaurant Association*, 556 F.3d at 130, the Court has evaluated the Statement of Interest based on the *Skidmore* factors.  *See also Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore* . . . .") (citation omitted).  Application of those factors warrants

the conclusion that the Statement of Interest "give it power to persuade, if lacking power to control." *See Skidmore*, 323 U.S. at 140.[11]

As mentioned previously, the Statement of Interest is a thorough and well-reasoned treatment of the issues raised by this case. The Statement, consistent with this Court's own independent analysis, examines the text, purpose, legislative history of the Federal Aviation Act to conclude that it "provides the Federal Aviation Administrator with exclusive authority in the field of air safety and airspace management." *See* Statement of Interest [doc. # 112] at 10. It then discusses relevant case law, explaining that:

> While the [Federal Aviation Act's] preemptive authority is well established, courts have distinguished between state regulation that directly affects air safety and airspace management, and facially neutral laws that have only a tangential impact. Generally applicable laws that do not regulate in the areas of aircraft operation, safety, or the use of navigable airspace are not preempted by the federal scheme.

*Id.* at 12. The Statement cites the Ninth Circuit's conclusion in *Skysign* that "the FAA's regulation of air safety does not 'preclude local regulation . . . that does not actually reach into the forbidden, exclusively federal areas, such as flight paths, hours, or altitudes,'" *id.* at 13 (quoting 276 F.3d at 1117), and notes that "those lower court decisions finding preemption, the challenged state laws did attempt to regulate in the specific areas cited in the *Skysign* decision." *Id.* at 13 n.8. The Statement also persuasively distinguishes this case from *Tweed* and *Burbank-Glendale*, 979 F.3d at 1338, finding Goodspeed's analogy to those cases "flawed . . . as neither the [Wetlands Act] nor [the] CEPA directly regulates airport operation or runway construction . . . . Central to [*Tweed* and *Burbank-Glendale*] was the fact that the state and local ordinances at

---

[11] The Court does, however, confine its consideration of the Statement of Interest to its discussion of Goodspeed's field preemption claim, and leaves aside the Statement's treatment of the express preemption argument, since that claim relies upon factual findings that were unavailable to the federal Government.

issue regulated airport construction or operation, thereby affecting air safety."   Statement of Interest [doc. # 112] at 14.   "In short," the Statement concludes, "state laws directly regulating and affecting air safety are preempted by the [Federal Aviation Act], while provisions that regulate areas of state and local concern are not facially preempted on a field preemption theory."   *Id.* at 15.[12]

The Statement of Interest also confirms that the Part 77 regulations "do not authorize the FAA to order the removal of an obstruction," and therefore, the Statement concludes, these regulations "are irrelevant for purposes of Plaintiff's field preemption claim."   *Id.* at 21. Nonetheless, "the agency has alternatives to ensure air safety once an obstruction has been identified."   *Id.* at 24.   And just as Mr. Downar testified, the Statement notes that "[t]rees constituting obstructions to navigable airspace are very common[,] and the FAA will, in these cases, alert aircraft operators of the obstruction so that they take necessary precautions."   *Id.*  "In sum," the Statement concludes, "tall trees affecting navigable airspace are commonplace, and the FAA will take the necessary steps to ensure safe operation. . . . [but] [t]he FAA's authority to intervene is limited, . . . and Goodspeed may not claim facial preemption of state environmental laws such as the [Wetlands Act] and [the] CEPA."   *Id.* at 25.   The Court agrees.

Finally, the Court also finds it significant that while the Statement acknowledges that "[t]he FAA has a strong interest in terrain growth at privately-owned and operated commercial

---

[12] The Statement of Interest also notes that were Goodspeed denied a permit by the Wetlands Commission to conduct *any* regulated activity, "the FAA would have very limited options to eliminate the hazardous conditions at Goodspeed Airport."  Statement of Interest [doc. # 112] at 16 n.10.   It states further that were the alternatives to lowering and/or trimming the trees inadequate, the Airport may have a viable claim of conflict preemption.  *See id.*  However, it concludes, and this Court agrees, that "[i]n the absence of both federal and/or state action on this issue, an as-applied challenge" – which, again, Goodspeed has not brought – "would be premature."  *See id.* at 24.

airports" like Goodspeed, *id.* at 23, and that "it is the FAA's responsibility to mitigate" any unsafe conditions that result from tree growth, *id.* Ex. A at 2, the Statement is also candid about the limitations of federal law generally and the authority of the FAA specifically.  The fact that the FAA has chosen not to attempt to aggrandize its own authority here – even while agreeing that federal law completely preempts the field of aviation safety – lends additional support to the conclusion that the Statement "reflect[s] the agency's fair and considered judgment on the matter in question."  *Auer*, 519 U.S. at 462.  In summary, the Statement of Interest is worthy of *Skidmore* deference, and the fact that its conclusions match those of the Court lends additional certainty to the holding that the Wetlands Act and the CEPA are not preempted in the circumstances of this case.

## CONCLUSION

Based on the foregoing, the Court concludes that the Defendants' actions in regulating the removal of trees at Goodspeed Airport that are within the protected wetlands are neither field preempted by federal aviation law nor expressly preempted by the ADA.  Accordingly, the Court enters judgment for the Defendants on all counts.  **The Clerk is directed to enter judgment for the Defendants and to close this file.**

IT IS SO ORDERED.


/s/     Mark R. Kravitz _____
        United States District Judge

Dated in New Haven, Connecticut: **January 11, 2010.**

55



APPENDIX A

## Legend

| SYMBOL | DESCRIPTION |
|--------|-------------|
| ● | DECIDUOUS TREE |
| (AGL) | ABOVE GROUND LEVEL |
| (TYP) | TYPICAL |

Connecticut River

TREELINE

AIRPLANE HANGARS

PRIVATE HOMES

TREELINE

SEE DETAIL 'A'

SCALE: 1"=500'

DETAIL 'A'

7:1 SLOPE

DETAIL 'B'

SCALE: 1"=5'

SCALE: 1"=100'

SCALE: 1"=100'

Location Map

1" = 2000 FT

SITE

Height of Side Slope
Goodspeed Airport
151 Lumberyard Road
East Haddam, Connecticut

Prepared for
Goodspeed Airport LLC

GESICK & ASSOCIATES P.C.